IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

| | |
|---|---|
| United States for the Use and Benefit of Thomas Industrial Coatings; and Thomas Industrial Coatings,<br><br>            Plaintiffs,<br><br>  vs.<br><br>Western Surety Company,<br><br>            Defendant. | **ORDER DENYING MOTION FOR SUMMARY JUDGMENT**<br><br>Case No. 1:18-cv-00174 |

      This case arises from a disagreement regarding payment for sandblasting and painting work performed on the Garrison Dam. The Plaintiffs, United States for the Use and Benefit of Thomas Industrial Coatings and Thomas Industrial Coatings ("TIC"), claim that the Defendant, Western Surety Company ("Western"), breached an obligation to pay TIC for that work under a subcontract payment bond. Western counters with this motion for summary judgment, filed on November 9, 2018, contending that TIC failed to tender notice of its claim, as the bond's terms require, before filing suit. Doc. Nos. 23-24. TIC responded in opposition to the motion on November 30, 2018, and Western filed a reply brief on December 14, 2018. Doc. Nos. 28, 32-33. For the reasons below, Western's motion for summary judgment is denied.

**I.    BACKGROUND**

      The controversy began to form in 2012, when the U.S. Army Corps of Engineers ("Corps") designated S&S Coatings, Inc. ("S&S") to act as the general contractor for a project on the

Garrison Dam. Doc. No. 1, ¶ 3. Upon receiving the contract, S&S obtained a Miller Act[1] payment bond from Western ("S&S Bond"). Id. ¶ 4. That bond obligated Western to pay subcontractors S&S hired for the labor and materials they contributed to the project if S&S failed to do so. Id. With the bond in hand, S&S subcontracted part of the project to Dix Corporation ("Dix"). Id. ¶ 6. Western issued a separate subcontract payment bond to Dix ("Dix Bond"), similarly promising to cover labor and material costs, this time for second-tier subcontractors, if Dix did not. Id. ¶ 8. Dix then subcontracted gate sandblasting and painting work to TIC. Id. ¶ 6. TIC furnished labor and materials in furtherance of the project, completing its work on August 22, 2017.[2] Id. ¶¶ 14-15.

Two distinct, but related, series of events prompted TIC to file the present action against Western. First, TIC had instituted a separate lawsuit against Dix regarding the Garrison Dam project in Washington state court on August 7, 2017, asserting breach of contract, fraud, and breach of warranty claims. See Doc. No. 30-25. On August 23, 2017, Dix informed TIC that it intended to withhold $525,000[3] in funds owed to TIC to cover litigation expenses in the Washington lawsuit. Doc. No. 30-5. On September 5, 2017, TIC sent a letter to representatives of both Dix and S&S challenging Dix's decision to withhold the funds. Doc. No. 30-6. In the letter, TIC referenced the $525,000 amount withheld and stated, "Dix'[s] action . . . will, unless immediate action is taken to prevent it, give rise to TIC taking legal action involving not only Dix, but also [S&S] . . . and

---

[1] The Miller Act mandates that general contractors on federal government projects furnish both a performance bond (insuring that the work will be completed satisfactorily) and a payment bond (insuring that the general contractor will pay its subcontractors for their work). 40 U.S.C. § 3131. The Act authorizes subcontractors and, in more limited circumstances, second-tier subcontractors to bring a civil action on the general contractor's payment bond. 40 U.S.C. § 3133(b).

[2] Western contests this date, but not for purposes of the current motion. Doc. No. 24, p. 3.

[3] This sum had apparently diminished to $323,317.95 by November 16, 2017. Doc. No. 30-21. The record does not clarify this discrepancy.

the sureties on this project." Id. at 2. TIC also requested that S&S and Dix "notify the sureties on this project of TIC's claim." Id. at 3.

Second, due to unforeseen delays and cost overruns associated with the project, S&S, in conjunction with Dix and TIC, submitted three claims to the Corps for equitable adjustment – in other words, claims for more money than what the original contract allowed for to compensate the contractors for the extra work required to finish the project. Doc. No. 30-3. The three claims totaled $3,124,056: $1,077,826 for "Paint Thickness"; $1,349,783 for "Stoplog Design Review/Delay"; and $696,447 for "Out of Scope Dewatering." Id. On August 21, 2017, the Corps "found partial merit" to the claims and proposed to settle them. Id. S&S accepted the Corps' offer and received $1,410,000. Doc. No. 30, ¶ 16.

Divvying up the $1.41 million the Corps paid to S&S, Dix sent an email on September 6, 2017—the day after TIC sent the letter regarding the Washington litigation—that proposed to pay TIC $419,089. Doc. No. 30-4. The payment breakdown earmarked TIC to receive $328,947 for the "Paint Thickness" claim; $90,142 for the "Out of Scope Dewatering" claim; and nothing for the "Stoplog Design Review/Delay" claim. Id. On October 5, 2017, Dix sent TIC a proposed change order to effectuate the $419,089 payment. Doc. No. 30-13. TIC then objected to the change order in a letter sent to representatives of both Dix and S&S dated October 9, 2017. Doc. No. 30-14.

In an email sent two days later, TIC detailed its objections. Doc. No. 30-16, p. 1. TIC contended that it was owed a total of $659,534 for the "Paint Thickness" and "Out of Scope Dewatering" claims, not the proposed $419,089. Id. As support, TIC pointed to previous statements Dix and S&S had made that represented TIC would receive a larger percentage of the Corps' equitable adjustment payment. Id. TIC also argued that S&S and Dix had improperly

3

refused to allocate any funds to TIC for the "Stoplog Design Review/Delay" claim. Id. The email did not specify what TIC believed it was owed on this final claim. Because of the dispute, TIC requested that S&S and Dix withhold the $419,089 payment and again notify their sureties. Doc. No. 30-14.

Western, as the surety on both the S&S Bond and the Dix Bond, sent two substantively identical letters to TIC in November 2017 confirming receipt of TIC's September 5, 2017 letter. Doc. Nos. 30-20, 30-23. In particular, a November 29, 2017 letter regarding the Dix Bond stated, "Western Surety Company is in receipt of your correspondence dated September 5, 2017 claiming that Thomas Industrial Coatings, Inc., is due payment for labor and material provided to the [Garrison Dam] Project." Doc. No. 30-23. Both letters sought additional documentation from TIC regarding its claims, noting the letters were sent for investigative purposes and did not confirm compliance with the bonds' requirements. Doc. Nos. 30-20, 30-23. TIC did not further respond to Western's letters.

The Plaintiffs filed this action on August 15, 2018, seeking "in excess of $2,244,817.46" in damages. Doc. No. 1, ¶ 18. Count I alleges that TIC is entitled to payment from the S&S Bond under the Miller Act, and Count II alleges a state-law claim for breach of Western's obligation on the Dix Bond. Id. ¶¶ 19-31. On January 2, 2019, the Plaintiffs moved to voluntarily dismiss Count I after resolving their claim against S&S. Doc. No. 34. The Court entered an order to that effect on January 17, 2019. Doc. No. 35. Remaining for disposition is Western's motion for summary judgment on Count II.

4

## II. DISCUSSION

A brief word on jurisdiction is necessary at the outset. With the dismissal of Count I, federal question jurisdiction pursuant to 28 U.S.C. § 1331 is no longer available. Under the supplemental jurisdiction statute, however, the Court retains jurisdiction over state-law claims even after the dismissal of all claims over which it has original jurisdiction. See 28 U.S.C. § 1367(a), (c)(3). Therefore, the Court continues to possess subject matter jurisdiction over TIC's state-law claim against Western for payment on the Dix Bond.

### A. Summary Judgment Standard and Principles of Contract Interpretation

Turning now to the pending motion, summary judgment is required "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank v. Mkt. Intelligence, Inc., 812 F.3d 701, 707 (8th Cir. 2016) (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249). If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as

to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)).

Western makes a single argument for summary judgment on Count II—that TIC failed to provide notice of its claim, as the Dix Bond's terms require, before filing suit. As a subcontract payment bond, ordinary principles of contract law, not the Miller Act, govern the Dix Bond. See Larson v. Granite Re, Inc., 532 F.3d 724 (8th Cir. 2008). The parties agree that North Dakota law controls. Accordingly, the Court will apply North Dakota Supreme Court precedent and attempt to predict how that court would decide any state-law questions it has yet to resolve. See Stuart C. Irby Co., Inc. v. Tipton, 796 F.3d 918, 922 (8th Cir. 2015).

The North Dakota Supreme Court recently explained its approach to contract interpretation this way:

> The interpretation of a written contract to determine its legal effect is a question of law. . . . The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity. When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible. A contract is interpreted as a whole so as to give effect to every part: Each clause is to help interpret the others.

In re Estate of Moore, 2018 ND 221, ¶ 8, 918 N.W.2d 69 (citations and quotation marks omitted). A contract for suretyship is interpreted using the same rules that apply to other contracts. N.D. Cent. Code § 22-03-04. With that in mind, contracts for suretyship are normally strictly construed in favor of the surety. See N.D. Cent. Code § 22-03-03. This rule relaxes, however, where a surety pays a premium for issuing its bond, as Western did here, and instead "the bond provisions are not to be construed strictly for or against either party, but reasonably as to both." Ireland's Lumber Yard v. Progressive Contractors, Inc., 122 N.W.2d 554, 562 (N.D. 1963).

6

### B. Third-Party Beneficiary Standing

Before delving into the notice requirement, a threshold question demands attention: does TIC have standing to sue on the Dix Bond? After all, TIC is not a party to the contract. The contract exclusively designates the parties to be Dix as the Principal, Western as the Surety, and S&S as the Obligee. See Doc. No. 1-2. Moreover, other district courts have found that second-tier subcontractors cannot recover directly from a subcontract payment bond under the Miller Act. See U.S. ex rel. Polied Envtl. Servs., Inc. v. Incor Grp., Inc., No. 3:02CV01254(GLG), 2003 WL 1797846, at *1 (D. Conn. Apr. 4, 2003); U.S. ex rel. DeGeorge Glass Co. v. R.M. Walker Constr. Co., Inc., Civ. A. No. 91-4039, 1992 WL 178682, at *1 (E.D. La. July 17, 1992). Instead, a second-tier subcontractor must establish that it is an intended third-party beneficiary of the subcontract payment bond. See DeGeorge, 1992 WL 178682, at *2. To that end, North Dakota law provides, "A contract made expressly for the benefit of a third person may be enforced by that person at any time before the parties thereto rescind it." N.D. Cent. Code § 9-02-04. For a third party to enforce a contract, the contracting parties must have intended for the third party to benefit from the contract. Peoples State Bank of Truman, Inc. v. Molstad Excavating, Inc., 2006 ND 183, ¶ 20, 721 N.W.2d 43.

The Dix Bond plainly intends for "claimants" to benefit from the contract. See Doc. No. 1-2. "Claimant" is in turn defined as "one having a direct contract with [Dix] for labor, material, or both, used or reasonably required for use in the performance of the contract." Id. The contract further states that if a claimant has not been paid for labor and materials within 90 days of its last day of work, that claimant "may sue on this bond." Id. In this instance, TIC had a direct contract with Dix to provide labor and materials for the Garrison Dam project. TIC claims that Dix failed to pay for labor and materials it provided for the project within 90 days of August 22, 2017 (TIC's

purported last day of work). Thus, TIC is a third-party beneficiary of the Dix Bond and has standing to enforce the contract.

C.  **Dix Bond Notice Requirement**

With standing resolved, the Dix Bond sets out three procedural requirements before a claimant is permitted to file suit. To comply, a claimant must (1) give "written notice" within 90 days of the claimant's last day of work to two of the following: Dix, S&S, or Western; (2) commence the action within one year of Dix's last day of work under its subcontract with S&S; and (3) file the suit in a North Dakota state or federal court. See id. Only the written notice requirement is now at issue.

Western contends that TIC tendered inadequate written notice because it failed to inform Dix, S&S, and Western that it intended to bring a civil action for the $2,244,817.46 amount stated in the complaint. In support, Western argues that the Court should construe the Dix Bond as requiring notice to be given with "substantial accuracy" of the claim amount, similar to the Miller Act's provision for claims by second-tier subcontractors against general contractors' bonds. See 40 U.S.C. § 3133(b)(2). In retort, TIC asserts that it provided adequate notice via its September 5, 2017 letter regarding the Washington litigation; its October 9, 2017 letter objecting to the proposed change order for the equitable adjustment payment; and the frequent email correspondence between the parties regarding TIC's claims.

Stated plainly, the Dix Bond did not require TIC to provide notice with substantial accuracy. By its terms, the bond makes no mention of a substantial accuracy requirement before filing suit. Rather, it merely says that a claimant must give "written notice." Doc. No. 1-2. As for the Miller Act's relevance, North Dakota law provides that "[a] contract may be explained by reference to the circumstances under which it was made and the matter to which it relates." N.D.

8

Cent. Code § 9-07-12. Here, the subcontract payment bond relates to a project that the Miller Act applies to, and so its provisions are pertinent to consider.

But contrary to Western's position, reading a substantial accuracy requirement into the Dix Bond's notice provision would contravene, not comport with, the Miller Act. Indeed, the Miller Act's substantial accuracy requirement applies only to claims by second-tier subcontractors against general contractors' bonds—where no direct contractual relationship exists between the parties. See 40 U.S.C. § 3133(b)(2). There is no notice requirement at all if a first-tier subcontractor makes a claim against a general contractor's payment bond. See 40 U.S.C. § 3133(b)(1). Another district court summarized this distinction adeptly:

> [W]hile sub-contractors (who are exempt from the notice requirement) submit their invoices directly to the general contractor, second-tier subcontractors submit their invoices to the subcontractor and therefore the general contractor has no notice of the outstanding invoices unless it is provided by the second-tier subcontractor. In order for such notice to be meaningful, however, it must provide the general contractor with some idea of the magnitude of the claim—hence the "substantial accuracy" requirement.

Trs. of Heating, Piping & Refrigeration Pension Fund v. Milestone Constr. Servs., Inc., 991 F. Supp. 2d 713, 719 (D. Md. 2014) (citation omitted). In other words, when there is a direct contractual relationship between the parties, the Miller Act does not require notice of a claim with substantial accuracy.

This makes intuitive sense because contracting parties know full well the obligations between them. In this case, for example, Dix informed TIC that it intended to withhold $525,000— which Dix knew it owed TIC—for attorney's fees in the Washington litigation. Doc. No. 30-5. Dix likewise sent the proposed change order for the equitable adjustment payment that TIC contests. Doc. No. 30-13. An explicit accounting of the claims, then, is rendered superfluous because Dix already comprehended their magnitude.

9

Beyond that, the North Dakota Supreme Court, in interpreting nearly identical notice provisions under subcontract payment bonds, has twice held that a surety need not receive any notice of a claim, much less notice with substantial accuracy. Robertson Lumber Co. v. Progressive Contractors, Inc., 160 N.W.2d 61, 78-79 (N.D. 1968); Ireland's Lumber Yard, 122 N.W.2d at 565. In short, nothing prevented Western from including a substantial accuracy requirement in the Dix Bond. It chose not to, and the Court declines to do so now. See N.D. Cent. Code § 9-07-19 ("In cases of uncertainty . . . the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.").

So, absent a substantial accuracy requirement, the question simply becomes whether TIC provided written notice that it intended to sue on the bond within 90 days of TIC's last day of work on the Garrison Dam project. "Generally, the question of whether a party had notice is . . . a question of fact." Chornuk v. Nelson, 2014 ND 238, ¶ 15, 857 N.W.2d 587. Admittedly, how TIC arrived at $2,244,817.46 for its total damages figure is unclear from the record. To declare as a matter of law, however, that TIC wholly failed to provide written notice of the claim would be inappropriate.

Regarding the $525,000 that Dix withheld for the Washington litigation, TIC sent representatives of Dix and S&S, as the Principal and Obligee on the Dix Bond, a letter on September 5, 2017 stating, "Dix'[s] action . . . will, unless immediate action is taken to prevent it, give rise to TIC taking legal action involving not only Dix, but also [S&S] . . . and the sureties on this project." Doc. No. 30-6, p. 2. TIC further asked that S&S and Dix "notify the sureties on this project of TIC's claim." Id. at 3. As for the equitable adjustment claims, TIC objected to Dix's proposed change order in an October 9, 2017 letter, again sent to Dix and S&S representatives, and requested that Dix withhold the proposed payment and notify the project's sureties. Doc. No.

30-14. Two days later, TIC followed up with an email spelling out its objections to the change order. Doc. No. 30-16. Additional emails regarding the claims bounced back and forth among the parties for weeks—all within the 90-day period after TIC's alleged last day of work on August 22, 2017. See, e.g., Doc. Nos. 30-7, 30-8, 30-10, 30-12. Western also later acknowledged receipt of TIC's correspondence that raised the possibility of a claim on the Dix Bond. Doc. No. 30-23. On these facts, a reasonable jury could find that TIC provided written notice in compliance with the Dix Bond's condition for filing suit.

As a separate observation, even if TIC's notice were inadequate as a matter of law, Western has not demonstrated how any lack of notice resulted in prejudice. North Dakota law on this point states, "A surety is exonerated. . . . [t]o the extent to which the surety is prejudiced by an omission of the creditor to do anything when required by the surety which it is the creditor's duty to do." N.D. Cent. Code § 22-03-06. Extrapolating from cases TIC cited, Western asserts that this rule only applies when a contract calls for "reasonable notice" and is inapposite when a definitive timeframe for notice is required. Not so. In fact, the North Dakota Supreme Court has explicitly applied the prejudice requirement to a 90-day notice provision contained in a strikingly similar subcontract payment bond. See Ireland's Lumber Yard, 122 N.W.2d at 565-66. Adhering to this decision, Western must demonstrate prejudice to escape its surety obligation. Should a jury conclude that TIC failed to provide written notice, Western will subsequently bear the burden of proving that it suffered prejudice. See Robertson Lumber Co., 160 N.W.2d at 79.

### III.    CONCLUSION

A genuine dispute of material fact remains as to whether TIC tendered written notice of its claim under the Dix Bond. The Court has carefully reviewed the entire record, the parties' filings,

and the relevant case law. For the reasons above, Western's motion for summary judgment (Doc. No. 23) is **DENIED**.

    **IT IS SO ORDERED**.

Dated this 7th day of February, 2020.

                                               */s/ Peter D. Welte*
                                               Peter D. Welte, Chief Judge
                                               United States District Court